## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WONDERMIND SRS 44, LLC and
BESPOKE WONDERMIND SPV I, LLC,

      Plaintiffs,

      v.

WONDERMIND GLOBAL INC.,
MANDY TEEFEY, DANIELLA PIERSON,
and SELENA GOMEZ,

      Defendants.

C.A. No.: _____

JURY TRIAL DEMANDED

## COMPLAINT AND DEMAND FOR JURY TRIAL

The Plaintiffs, Wondermind SRS 44, LLC and Bespoke Wondermind SPV I, LLC, hereby sue the Defendants, Wondermind Global Inc., Mandy Teefey, Daniella Pierson, and Selena Gomez, and allege:

## NATURE OF THE ACTION

The Plaintiffs invested nearly $1.2 million in Wondermind Global Inc. ("Wondermind" or the "Company") because the Defendants falsely represented that the Company had the infrastructure, leadership, and resources necessary for the Company to launch into a profitable, one-of-its-kind mental health and wellness platform. Among other misrepresentations, the Company, including through the Individual Defendants, who directly solicited the Plaintiffs' investments, told the Plaintiffs three things: that Selena Gomez, one of the most famous women on earth with a billion-dollar brand and a platform unmatched in social media, would be actively building the Company as its head of marketing; that co-CEO Daniella Pierson was a $200 million executive whose prior businesses generated $40 million a year and who had already secured institutional employer partnerships with JPMorgan and Fidelity; and that a full slate of revenue-

generating initiatives, including advertising deals, celebrity cover stories, and a groundbreaking app, were already underway. These representations were false.

Gomez purported to sign a contract obligating her to perform and then ignored it. The partnerships did not exist. The initiatives never materialized. The app was never built. And for three years, while the Company quietly collapsed around them, not one of its founders, officers, or directors said a word to the investors whose money was funding the collapse. Instead, after years of concealment, the Plaintiffs learned what had happened only from an online news article published in September 2025. In detail, that article outlined the state of utter disarray at the Company, including Teefey's apparent substance abuse disorder and her gross mismanagement of the Company; Gomez's abject dereliction of her duties to the Company and, indeed, her active efforts to distance herself from it, given her long-running personal struggles with her mother, Teefey; an executive power struggle at Wondermind, resulting in Pierson's ouster from the Company and a leadership void; and the Company's failure to meet even its most basic obligations, such as timely paying its employees and vendors. The information unearthed in this article proved not only that the Company was, and is, in a state of financial calamity; it proved that the Defendants' representations about the Company's operations, personnel, and financial prospects were a fiction. There was no legitimate enterprise in the works, much less a lucrative one.

The Plaintiffs accordingly bring this Complaint for securities fraud under Rule 10b-5 of the Securities Exchange Act of 1934, common law fraud, and breach of contract, among other claims. The Plaintiffs seek rescission of their investments in Wondermind, damages, costs, attorney's fees, and any other relief to which they are entitled under applicable law.

## THE PARTIES, JURISDICTION, AND VENUE

**I.    THE PARTIES**

1.    Plaintiff Wondermind SRS 44, LLC ("SRS 44") is a Florida limited liability company, with its principal place of business in Florida. The members of SRS 44 are Brent Saunders and Marc Roberts (both citizens of Florida), and EJ Solimine (a citizen of New Jersey).

2.    Plaintiff Bespoke Wondermind SPV I, LLC ("Bespoke") is a Delaware limited liability company, with its principal place of business in Florida. The members of Bespoke are Andrew Resnick (a citizen of Florida) and Mark Peikin (a citizen of New York).

3.    Defendant Wondermind Global Inc. is a Delaware corporation, with its principal place of business in New York, New York.

4.    Defendant Mandy Teefey ("Teefey") is a citizen of California. At all relevant times, Teefey had the power to influence and control, and did influence and control, directly and indirectly, the decision-making of Wondermind, including in particular the content and dissemination of the various false or materially misleading statements described in this Complaint.

5.    Defendant Daniella Pierson ("Pierson") is a citizen of New York. At all relevant times, Pierson had the power to influence and control, and did influence and control, directly and indirectly, the decision-making of Wondermind, including in particular the content and dissemination of the various false or materially misleading statements described in this Complaint.

6.    Defendant Selena Gomez ("Gomez") is a citizen of California. At all relevant times, Gomez had the power to influence and control, and did influence and control, directly and indirectly, the decision-making of Wondermind, including in particular the content and dissemination of the various false or materially misleading statements described in this Complaint.

3

7. Unless otherwise indicated, or unless the context of a specific allegation suggests otherwise, this Complaint references Teefey, Pierson, and Gomez, collectively, as the "Individual Defendants."

## II. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, because the Plaintiffs' claims arise under federal law (i.e., Rule 10b-5 of the Securities Exchange Act of 1934). The Court has supplemental jurisdiction over the Plaintiffs' state law claims under 28 U.S.C. § 1367 because the state law claims are so related to the Plaintiffs' federal securities fraud claims, that they form part of the same case or controversy as those federal claims.

9. The Court has personal jurisdiction over each Defendant. In particular, Wondermind is a Delaware corporation and, accordingly, it is subject to the Court's general personal jurisdiction. The Court also has personal jurisdiction over Wondermind under Section 6.13 of the Series A Preferred Stock Purchase Agreement between the Plaintiffs and Wondermind (the "SPA"), to which Wondermind agreed, and which provides for venue in this district.

10. The Court has personal jurisdiction over the Individual Defendants because, as officers and directors of Wondermind, the Individual Defendants consented to jurisdiction in Delaware for any lawsuit relating to actions taken as officers and directors, under 10 Del. C. § 3114. The Individual Defendants are also subject to personal jurisdiction in this Court under 15 U.S.C. § 78aa, which authorizes nationwide service of process for suits brought under the Securities Exchange Act of 1934. Because each Individual Defendant has sufficient minimum contacts with the United States, given that each resides in the United States, the Court has personal jurisdiction over them.

4

11.     As to each Defendant, the Court's exercise of personal jurisdiction complies with due process requirements. Finally, because the Court has personal jurisdiction over all Defendants with respect to the Plaintiffs' federal securities fraud claims, the Court has pendent personal jurisdiction over the Defendants with respect to the Plaintiffs' state law claims.

12.     This district is the proper venue for this action under Section 6.13 of the SPA, which provides, in relevant part, that the parties "hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Delaware and to the jurisdiction of the United States District Court for the District of Delaware" for "the purpose of any suit, action or other proceeding arising out of or based upon this Agreement." Additionally, venue is proper under 28 U.S.C. § 1391(b)(3), as the Court has personal jurisdiction over the Defendants.

13.     Section 6.3 of the SPA provides that "[t]his Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware."

## TOLLING ALLEGATIONS

14.     As discussed further below, the Defendants concealed their fraud from the Plaintiffs for more than three years. The Plaintiffs did not discover the facts underlying their claims until September 3, 2025, when an online publication—*The Cut*—published a detailed article about the state of Wondermind's operations, titled: "What Happened at Wondermind? Selena Gomez and her mother, Mandy Teefey, flipped their mental-health journeys into a buzzy start-up. It all fell apart" (the "Cut Article" or the "Article").

15.     The Cut Article—published over three years after the closing of the Plaintiffs' investments in the summer of 2022—unearthed key facts both about the utter financial and operational disarray at Wondermind, and about the false and misleading nature of several

5

representations that the Company and the Individual Defendants made to the Plaintiffs to induce their investments. Among other facts, and as described further below, the Cut Article revealed for the first time:

- That Teefey, the nominal co-CEO of Wondermind, appeared to have a long-running substance abuse problem, which significantly impeded her capacity to administer the Company;

- That based on a long-running family dispute between her and Teefey, Gomez had actively sought to distance herself from Wondermind, in direct contravention of the Company's representations to the Plaintiffs that Gomez would play an active role in, and even provide services to, Wondermind;

- That Pierson, who purported to have significant managerial experience, had been ousted from the Company based on an interpersonal dispute with Teefey, leaving a substantial leadership void; and

- That in the three years after the Plaintiffs' investments, the Company had failed to meaningfully operationalize the products and services that the Company promoted to the Plaintiffs to solicit their investments, including the Wondermind App, which was to be the centerpiece of the Company.

16.     The facts first unearthed in the Article on September 3, 2025 support the tolling of the statute of limitations for the Plaintiffs' state law claims.

17.     First, the Plaintiffs' injury was inherently unknowable until the publication of the Cut Article, there being no observable or objective factor available to a minority investor in the Plaintiffs' position that would have signaled otherwise, and the Plaintiffs were blamelessly ignorant of the Defendants' fraud until such publication. Among other conduct, as minority investors in the Company, the Plaintiffs had limited information rights and relied on the Defendants to provide updates about the status of their investments and the Company's operations. As discussed further below, the Defendants consistently withheld information from the Plaintiffs until the Plaintiffs pressed for updates. In the limited updates that the Defendants did provide, they

both affirmatively misrepresented the status of the Company's operations and concealed material information about ongoing issues at the Company.

18.    Second, and relatedly, the Plaintiffs' ignorance was a result of the Defendants' concealment or fraud. The Defendants concealed their conduct—and thus prevented the Plaintiffs from discovering the existence of their claims—because, among other conduct: (i) the Defendants took affirmative steps to conceal the Company's operational, financial, and management issues, including in the minimal updates that they provided, such as the December 8, 2022 correspondence and the March 9, 2025 correspondence described later in this Complaint, each of which affirmatively represented that the Company was thriving at a time when, as the Cut Article later confirmed, it was not; (ii) the Defendants' conduct was internal to the Company's operations and, accordingly, was not susceptible to discovery by a reasonably diligent investor; and (iii) the Defendants acted to lull the Plaintiffs and other investors, including by affirmatively misrepresenting that the Company was performing well and poised for success, even when they knew that the Company had significant operational, financial, and management issues.

19.    Third, as officers, directors, majority shareholders, and control persons of the Company, the Individual Defendants owed the Plaintiffs the fiduciary duties of care, loyalty, and good faith. The Plaintiffs reasonably relied on the Individual Defendants' good-faith administration of the Company, including the periodic reports that the Individual Defendants controlled, and such reliance was reasonable until September 3, 2025.

20.    Indeed, after the Plaintiffs sent the Defendants a notice of rescission in November 2025, Teefey contacted Resnick, Bespoke's representative, suggesting that the Plaintiffs should forbear from filing suit because the Company had created an "escrow account" to facilitate the return of the Plaintiffs' investments. After Resnick repeatedly followed up with Teefey to obtain

further details about this supposed escrow account and the return of funds, Teefey disappeared. In short, there was no "escrow account" or a plan to return the Plaintiffs' investments. Instead, this bizarre interaction reinforces the lengths to which the Defendants have gone—and will continue to go—to conceal their fraud, lull the Plaintiffs, and evade accountability.

21.     As a result of the conduct described in this section and elsewhere in this Complaint, under Delaware law, the discovery rule, the Defendants' concealment, and the doctrine of equitable tolling all toll the running of the statute of limitations for the Plaintiffs' state law claims until September 3, 2025, when the Plaintiffs first learned of these facts.

<strong><u>GENERAL ALLEGATIONS</u></strong>

**I.     WONDERMIND'S PURPORTED BUSINESS MODEL**

22.     Wondermind held itself out as a mental health startup whose mission was to make mental health content accessible to a mass audience through a digital platform, and to help its users strengthen their "mental fitness."

23.     Launched in 2021, Wondermind relied heavily on its affiliation with Selena Gomez—one of the most famous celebrities in the world, with an estimated net worth approaching $1 billion, and a combined social media following of over 500 million people. Today, Gomez has over 400 million Instagram followers, making her the most-followed woman on Instagram. On its website, and in its marketing material, Wondermind boasts its affiliation with Gomez, describing her as the Company's "Co-Founder." Indeed, to this day, Gomez holds herself out on LinkedIn as Wondermind's CIO or "Chief Impact Officer"—a signal of the central role that Gomez was expected to play in the Company. As discussed further below, in addition to her role as a Co-Founder and CIO, Gomez held a significant ownership interest—approximately 16%—in Wondermind.

24.     Given the demands on Gomez's time, Wondermind decided to vest day-to-day management of the Company in two individuals, Teefey and Pierson, who would initially serve as co-CEOs of the Company.

25.     Teefey is Gomez's mother. Upon information and belief, before her executive role at Wondermind, Teefey did not have any experience in managing a technology startup, or any enterprise with a business model similar to that of Wondermind. Instead, it appears that Teefey worked predominantly in the entertainment industry, helping to manage Gomez's career, and overseeing other entertainment projects. Teefey is presently the CEO of Wondermind. In addition to her role as Co-Founder and CEO, Teefey holds a significant ownership interest—approximately 32%—in Wondermind.

26.     Pierson, for her part, purports to be an experienced businessperson. Before her role as co-CEO of Wondermind, Pierson was (and still is) the Founder and CEO of *The Newsette*, an online media company whose primary product is a daily culture and lifestyle newsletter. Since her departure from Wondermind in January 2023, Pierson's credibility has been the subject of intense scrutiny. In August 2025, for example, *Forbes* published an article titled "'Smoke and Mirrors': How This Entrepreneur Exaggerated and Self-Promoted Her Way Into Turmoil." Among other revelations, the article concluded that Pierson had inflated the subscriber counts for her newsletter, representing in investor pitch materials that *The Newsette* had approximately 1.3 million subscribers, when the actual count was significantly lower. The *Forbes* article also reported critically on Pierson's public claims that *The Newsette* is worth over $200 million, suggesting that these claims were contradicted by *The Newsette*'s own internal records. In addition to her role as Co-Founder and co-CEO of Wondermind, Pierson held a significant ownership interest—approximately 33%—in the Company.

27.     Given what the Company characterized as Pierson's significant business experience, including leading *The Newsette*, the Company represented that Pierson would exercise primary managerial control over Wondermind's business operations and strategy, and that Teefey—who did not have this expertise—would lead its creative projects.

28.     As an early Wondermind investor pitch deck from 2022 bluntly announced, at the time of the Company's Series A offering—i.e., the offering in which the Plaintiffs invested—Wondermind had "ZERO users," "ZERO launched products," and "ZERO revenue." Instead, the Company had "[j]ust 4 team members (including founders) and a big vision."

29.     As discussed below, the "vision" that Wondermind sold to the Plaintiffs was a vision for rapidly scaling the mental health startup to a full suite of digital products, including an editorial publication, a mobile application (i.e., the Wondermind App), an original podcast, and related wellness products, which would collectively generate significant revenue for the Company. To facilitate the sale of that "vision," and to justify the Plaintiffs' investment at a relatively high valuation for a fledgling startup that admittedly had "ZERO" users, products, or revenue, Wondermind represented, among other things, that Gomez would remain intimately involved in the Company, including in marketing and publicity efforts; that the Company already had the business partnerships in place to allow it to quickly monetize its services; and that the Company was in safe hands with its executives, including Pierson, who the Company touted as a rising star in business. As shown below, it turned out that Wondermind had no plan at all, much less an achievable "vision."

## II.     THE DEFENDANTS' REPRESENTATIONS IN CONNECTION WITH THE PLAINTIFFS' INVESTMENTS

30.     In the spring of 2022, Wondermind opened an investment offering for investments in the Company's Series A Preferred Stock.

31.     Underscoring her role with Wondermind and her involvement in the investment process, around the same time, Gomez was publicly promoting the Company with the aim of creating buzz—both with the media and with potential investors.

32.     In April 2022, ahead of the Series A financing round, for example, *Good Morning America* published a video interview with Teefey, Gomez, and Pierson. During that interview, Gomez spoke at length about her challenges with mental health, about the promise of her new venture, Wondermind, and about the mental-health resources that Wondermind would offer. Likewise, in August 2022, shortly after the closing of the Plaintiffs' investments, *Good Morning America* reported on a public statement by Teefey, Gomez, and Pierson on Instagram "that explained how they plan to use the funds." The outlet reported that, according to the Individual Defendants, the Series A funding "'will be used to accelerate the building of Wondermind's mental fitness ecosystem across our daily online content, CPG products, and original storytelling for all platforms.'"

33.     At the time of the offering, Wondermind provided potential investors, including the Plaintiffs, with a pro forma capitalization table, indicating that as of the offering, the Company had a "pre-money" valuation of $95 million, that it was seeking an additional $5 million investment, and that the Company would have a "post-money" valuation of $100 million.

34.     Before the Company's offering of Series A Preferred Stock, the Company's primary shareholders were Gomez, Teefey, and Pierson, who collectively controlled approximately 90% of the Company's shares, with the remaining shares owned by friends, family, and early-stage investors. As reflected in the pro forma cap table, the Company's initial investors had invested approximately $12 million in Wondermind. Accordingly, one of the major purposes of the Series A Preferred Stock offering—in which the Company sought an additional $5 million

11

investment, or roughly 40% of its pre-existing capital—was for the Company to raise funds to allow it to finally launch and operationalize, as the Individual Defendants publicly represented.

35.     In connection with the offering, Wondermind, including through the Individual Defendants, made several representations to induce the Plaintiffs into purchasing Series A Preferred Stock. These representations focused on Wondermind's business plan and strategy; its contemplated products, services, and initiatives; its financial health; and its growth trajectory. To be clear, as Wondermind has admitted in its own marketing materials, including the 2022 investor pitch deck, at the time of the offering, Wondermind had "ZERO" users, products, or revenues. Accordingly, the representations discussed below—centering on the Company's plans for launching, operationalizing, and growing—were material to the Plaintiffs' investment decisions, including because they understood that the purpose of their investments was to fund the Company's transition from a nascent business concept to an operational enterprise.

36.     In May 2022, Resnick and Peikin, the members of Bespoke, met with Pierson in New York City to discuss Bespoke's potential investment in the Company (the "New York City Meeting"). During that meeting, Pierson provided Resnick and Peikin with a summary of her purported accolades, an overview of the investment offering, and an explanation of the Company's plans for operationalizing and growing its mental health products, services, and initiatives.

37.     Critically, in an effort to bolster her purported business savvy, Pierson told Resnick and Peikin that she was worth approximately $200 million, and that her pre-existing business, *The Newsette*, generated approximately $40 million in yearly revenue—a figure that Wondermind could likewise expect to earn in short order under her leadership of the Company. As noted above, based on recent public reporting casting significant doubt about Pierson's claims concerning the value of *The Newsette*, the Plaintiffs now know that these representations were false.

12

38. Additionally, consistent with Wondermind's marketing of Gomez as the face of the Company, Pierson told Resnick and Peikin that Gomez would not be a mere figurehead or passive investor and, indeed, that she would have major operational involvement in the Company as its "head of marketing," providing the Company with immediate access to an audience of over 500 million people through Gomez's various social media channels.

39. Finally, at the New York City Meeting, Pierson told Resnick and Peikin that she had already secured business partnerships with several large employers—such as JP Morgan and Fidelity—for Wondermind to provide mental health and wellness services to their employees, which would help the Company immediately generate significant and predictable revenue outside of its contemplated digital products.

40. Critically, the impression that Pierson conveyed at the New York City Meeting was that Wondermind was in capable hands under her stewardship, and that the Company had the necessary infrastructure—people, products, and services—to launch and succeed quickly.

41. Shortly after Pierson's initial New York City Meeting with Resnick and Peikin, Pierson met with Saunders, SRS 44's representative, to discuss SRS's potential investment. During that meeting, Pierson repeated, to Saunders, the same representations about the investment opportunity that she had initially made to Resnick and Peikin at the first meeting.

42. A few weeks later, Pierson wrote to the Plaintiffs with more information about the investment opportunity. In an email dated June 6, 2022 (the "June 2022 Email"), Pierson made additional representations about Wondermind's operations, services, and expansion plans. Attaching a "pre-launch investment 2-pager," Pierson represented, among other things (emphasis in original):

- That Wondermind had "grown to over **150,000 subscribers** in just one month before our paid marketing strategy has even started!";

- That Pierson had met with executives of other companies regarding "large advertising deals, and we anticipate closing at least $5M in ad revenue this year";

- That the Company had "interest or confirmation for 'Cover Story' features from some of the biggest names in the world including people such as Camila Cabello, Tim Cook, Elton John, Drake, Megan Thee Stallion, and more";

- That the Company had hired individuals to fill 15 positions, including a Director of Development, a Director of Editorial, a Head of Partnerships, a Chief Operating Officer, and a Director of Marketing & Brand;

- That the Company would be working to create "our first 3 physical product concepts";

- That the Company had "just started to build our online editorial experience -- the first step in our goal to capture millions of people who search for mental health content *daily*"; and

- That the Company had "started to build out our custom ambassador/referral program which we believe will be huge for our subscriber growth."

As with Pierson's representations at the New York City Meeting, by touting Wondermind's purported operational structure—including its supposed subscriber count, supposed products, supposed offerings, and supposed growth trajectory—the June 2022 Email likewise induced the Plaintiffs into believing that the Company had the foundation necessary to operationalize.

43.     In retrospect, Wondermind's "pre-launch investment 2-pager" is notable for the unrealistic—indeed, baseless—projections about the Company's growth. Touting Pierson's supposed "$40M/year revenue media company that generates 8-figures in profit," "Selena's 400 million followers and waitlist promo," and "excitement from the biggest retailers in the US" to distribute Wondermind's products, the "2-pager" represented that the Company's three "verticals"—Media, Product, and Production—had a "potential future value" of over *$4 billion*:

14

| Potential Future Value:<br>**$1B+**<br>MEDIA | Potential Future Value:<br>**$2B+**<br>PRODUCT | Potential Future Value:<br>**$1B+**<br>PRODUCTION |
|---|---|---|
| UNFAIR ADVANTAGES: | UNFAIR ADVANTAGES: | UNFAIR ADVANTAGES: |
| - Co-CEO has built a $40M/year revenue media company that generates 8-figures in profit<br><br>- Fortune 500 brands have already reached out with interest to commit significant marketing budgets to Wondermind to support mental health<br><br>- Immediately able to launch with 100,000+ community thanks to Selena's 400 million followers and waitlist promo | - We've already received excitement from the biggest retailers in the US to not only sell all product nation-wide, but also set up large Point of Sale and marketing because of our first-to-market offering<br><br>- Built-in marketing funnel via highly impactful media and production arm<br><br>- Ability to partner with world's largest brands for collaborations | - Incredible relationships with world's biggest studios and streamers thanks to Mandy and Selena<br><br>- Ability to lock in upfront, highly-lucrative first-look deal<br><br>- Access to the world's best IP<br><br>- Track record of launching one of the most successful mental health shows in history |

44.     Importantly, although each of these representations was, individually, material to the Plaintiffs' investment decision, perhaps the most salient consideration for the Plaintiffs was the Company's representation that Gomez would be actively involved in, and that she would have a key executive and leadership role in, Wondermind.

45.     To be clear, the Plaintiffs understood that Wondermind's value as a nascent company lay largely in Gomez's involvement, including her ability to market the Company to a pre-existing, substantial, and loyal follower base. This understanding was reinforced by Gomez's own involvement in the investment process, which included, among other conduct, assisting Teefey and Pierson in identifying, soliciting, and securing investments from potential investors. In a December 8, 2022 email to Peikin of Bespoke, for example, Pierson, copying Gomez, touted the Company's purported success and acknowledged that she, Gomez, and Teefey were in the process of raising the Company's Series B round. Pierson wrote (emphasis in original):

15

Hi Mark - I hope you've been well and it's a pleasure to connect as Selena Gomez (cc'd), Mandy Teefey (cc'd), and I raise our Series B.

Wondermind has had massive growth since our April debut of JUST the newsletter (+ exceeded all of our 1-year goals in only 6 months) and therefore have been reached out to by several multi-billion-dollar funds, banks, etc. to lead a Series B. We've also closed **$1.7M in revenue from <u>JUST the newsletter</u> in only <u>5 months</u>** without a proper sales team.

**Here's the deck: <u>WONDERMIND SERIES B.</u>**

Thanks and let us know if we can save allocation for you during this fast-paced round?

46.    As a result, Gomez was not merely incidental to the investment process; in her capacity as a shareholder of, officer of, and purported "head of marketing" for the Company, she was central to it. As alleged further below, based on each Individual Defendant's direction and control of corporate policy, along with their personal participation in the securities sales at issue in this Complaint, the Individual Defendants are subject to control-person liability for the offending sales.

## III.    THE INVESTMENTS AND THE TRANSACTION DOCUMENTS

47.    In reliance on these representations, the Plaintiffs purchased Series A Preferred Stock in Wondermind: SRS invested approximately $425,000 in May 2022, and Bespoke invested $750,000 shortly thereafter, in June 2022.

48.    In connection with its investments, each Plaintiff executed or otherwise received several transaction documents related to the investment, namely, the SPA; the Company's Certificate of Incorporation; a Compliance Certificate; Disclosure Schedules; an Investors Rights Agreement; a Right of First Refusal and Co-Sale Agreement; and a Voting Agreement (collectively, the "Transaction Documents").

49.     The SPA, in particular, memorialized several key terms concerning the Plaintiffs' investment in Wondermind.

### *Wondermind's Agreement to Use Funds Only for Legitimate Business Purposes*

50.     With respect to the use of the Plaintiffs' investment funds, for example, in the SPA, Wondermind agreed to use the funds only for legitimate business purposes. Specifically, Section 1.4 of the SPA (titled "Use of Proceeds") provides in relevant part that: "In accordance with the directions of the Board of Directors . . . the Company will use the proceeds from the sale of the Shares for product development and other general corporate purposes."

51.     Notably, Section 1.4 of the SPA mirrored what the Defendants had represented to the Plaintiffs was the primary purpose of the Series A Preferred Stock offering: i.e., to accelerate product development, operationalize Wondermind, and grow the Company.

### *Wondermind's Representations and Warranties*

52.     The SPA also contains key terms about Wondermind's business plan, which, as noted, was an integral part of the Defendants' pre-investment representations, including the representation that the Company had a "potential future value" of over $4 billion.

53.     In Section 2.24 of the SPA, for example—which is part of Wondermind's representations and warranties to the Plaintiffs—Wondermind represented that although it "does not warrant that it will achieve any results projected in the Business Plan," including projections provided to the Plaintiffs, the plan "was prepared in good faith." Wondermind also agreed in Section 2.24 that none of its representations and warranties in the SPA was materially false or misleading:

> No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchasers at the Closing contains any untrue statement of a material fact or, to the Company's knowledge, omits to state a material fact necessary in order to make

17

the statements contained herein or therein not misleading in light of the circumstances under which they were made.

54.     The SPA also contains several other representations and warranties central to Wondermind's operations, including representations concerning the Individual Defendants' roles.

55.     In Section 2.15(c) of the SPA, for example—part of a section titled "Employee Matters"—Wondermind represented and warranted that its "Key Employees" would remain employed with the Company.

56.     Specifically, Wondermind represented and warranted that: "To the Company's knowledge, no Key Employee intends to terminate employment with the Company or is otherwise likely to become unavailable to continue as a Key Employee. The Company does not have a present intention to terminate the employment of any of the foregoing."

57.     Section 1.5(g) of the SPA, in turn, provides that the term "Key Employee" means "the following officers: Daniella Pierson, Mandy Teefey and Bhavik Trivedi."

58.     As discussed further below, the representation and warranty in Section 2.15(c) of the SPA *could not have been* true when made because, at the time that the Plaintiffs invested, a long-running feud between Teefey and Pierson was already underway—and would culminate in Pierson's ouster from the Company in January 2023, just months after the investment transaction. Indeed, Teefey and Pierson, in their capacities as co-CEOs of Wondermind, signed the SPA on behalf of the Company, making incredible any claim that either Teefey or Pierson lacked the requisite knowledge about the accuracy of this representation.

59.     Notably, the SPA provides that Wondermind's representations and warranties survive the execution of the Agreement, and that the representations and warranties "shall in no way be affected" by the Plaintiffs' subsequent investigation into the subject matter of the representations and warranties. In this connection, Section 6.1 of the SPA states:

18

**Survival of Warranties.** Unless otherwise set forth in this Agreement, the representations and warranties of the Company and the Purchasers contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and each Closing and shall in no way be affected by any investigation or knowledge of the subject matter thereof made by or on behalf of the Purchasers or the Company.

### *Wondermind's Agreement Regarding Gomez's Involvement in the Company*

60.     Moreover, consistent with the Defendants' representations at the New York City Meeting, in the June 2022 Email, and throughout the investment process that Gomez would have an active role at Wondermind, the SPA contains several terms memorializing the nature of—and reinforcing the importance of—Gomez's involvement.

61.     Section 4 of the SPA, for example—titled "Conditions to the Purchasers' Obligations at Closing"—expressly outlines several closing conditions, providing that: "The obligations of each Purchaser to purchase Shares at the Initial Closing or any subsequent Closing are subject to the fulfillment, on or before such closing, of each of the following conditions, unless otherwise waived . . . ."

62.     One of the express closing conditions was that Gomez would sign a "Consulting Agreement" to govern the services that she would provide to Wondermind.

63.      Specifically, Section 4.15 of the SPA provides that it was an express closing condition for Gomez to "have entered into a services agreement with the Company concerning the matters set forth on **Exhibit I**" (emphasis in original). Although Wondermind purported to attach a form of the Consulting Agreement to the SPA, critically, *neither* Plaintiff has ever received a copy of the purported Consulting Agreement, in contravention of the express closing condition. To the extent that the Consulting Agreement even exists (which the Plaintiffs do not concede), Gomez utterly breached her contractual duties, including by taking steps to actively distance herself from the Company based on several undisclosed personal disputes with Teefey.

*The Plaintiffs' Limited Information Rights Under the Transaction Documents*

64.     Finally, in connection with their investments, the Plaintiffs executed an Investors Rights Agreement.

65.     Section 3 of the Agreement, titled "Information Rights," required Wondermind to provide "Major Investors" with certain categories of information.

66.     Under Section 3.1, titled "Delivery of Financial Statements," for example, Wondermind agreed to "deliver to each Major Investor [as defined the Agreement]" four categories of financial information within the deadlines specified in the provision: (i) financial statements for the previous fiscal year, prepared in accordance with Generally Accepted Accounting Principles; (ii) unaudited financial statements, on a quarterly basis, prepared in accordance with GAAP; (iii) a budget and business plan for the next fiscal year; and (iv) "such other information relating to the financial condition, business, prospects, capitalization, or corporate affairs of the Company as any Major Investor may from time to time reasonably request."

67.     As minority investors in the Company, the Plaintiffs did not meet the definition of "Major Investor" in the Investors Rights Agreement. Instead, the Plaintiffs relied on the Defendants to provide information about the status of their investments and of the Company's operations. As discussed in the next section, the Defendants generally withheld information about the Company's operations from the Plaintiffs until the Plaintiffs prodded them for information. In the limited updates that the Defendants did provide, though, the Defendants concealed material issues from the Plaintiffs, and affirmatively misrepresented the status of the Company's operations. Likewise, unlike with the Major Investors, the Plaintiffs never received financial information, such as financial statements, from the Defendants during the life of their investment.

* * *

68.    As specified in the SPA, the initial members of Wondermind's board of directors would be Teefey and Pierson, with a vacancy for a third board member. The Individual Defendants would also serve as officers of the Company: Teefey and Pierson as co-CEOs, and Gomez as "Chief Impact Officer" and head of marketing. Finally, as was the case before the Series A Preferred Stock offering, the Individual Defendants would continue to collectively hold a majority stake in the Company—i.e., approximately 81% of the Company's shares.

69.    As a result, in these capacities—as directors, officers, and majority shareholders—the Individual Defendants owed the Plaintiffs the fiduciary duties of care, loyalty, and good faith.

## IV.    THE CUT ARTICLE REVEALS THE DEFENDANTS' FRAUD

70.    After the Plaintiffs' investment, the communications with the Defendants followed a predictable pattern: the Defendants kept the Plaintiffs in the dark about the Company's operations until the Plaintiffs prodded them for an update.

71.    From 2022 to 2025, the Plaintiffs proactively contacted Teefey and Pierson (until her departure) for updates. On the occasions when the Defendants would provide updates—either by email or on a phone call—they concealed the significant operational and financial issues at the Company. Indeed, the Defendants affirmatively misrepresented that the Company was performing well.

72.    The following exchange between Resnick and Teefey in March 2025—six months before the publication of the Cut Article—is representative of the Defendants' deceit.

73.    Frustrated with the lack of communication from the Defendants, on March 6, 2025, Resnick emailed Teefey for an update, writing (emphasis added): "Hi, I wanted to follow up and get some updates on how the business is going. *Have tried connecting with all of you multiple times and not sure why we can't connect.* Please send over some availability."

21

74.   On March 9, 2025, after Resnick had pressed for "information on the company and how the progress is going," Teefey responded:

Hi Andrew -

We took a beat from Fundraising during the election and to restructure prepping for our app launch (most likely a huge Summer launch, does have AI and a social platform). I. have attached our new deck that we are getting ready to go out with. We have only passed this on to two investors and one is presenting at the 1,000,000 level and the other is coming back with a multi-mil proposal. We are currently being courted by a huge player in media/Entertainment that we are extremely excited about. I am in NY for a fireside chat at the NBA Womens Leadership Forum with Hannah Storm. Also, have a meeting with branding and marketing to propose being the mental fitness partner of the NBA! So, we had a bit of a lull as all of this was being courted and executed, but we are also Asics partners at the LA Marathon this upcoming weekend.

75.   In other words, as Wondermind was in the midst of collapse—as would soon be revealed in the Cut Article—Teefey was continuing to represent to the Plaintiffs that the Company was performing so well that it was "being courted by a huge player" for a potential acquisition.

76.   In August 2025, the Plaintiffs would first learn of the significant issues at Wondermind.

77.   In this connection, on August 8, 2025, *Forbes* published an article about Pierson titled, "'Smoke and Mirrors': How This Entrepreneur Exaggerated and Self-Promoted Her Way Into Turmoil" (the "Forbes Article"). Noting that "Pierson's businesses seem to be unraveling," the Forbes Article reported that Pierson appeared to have inflated the subscriber counts for her newsletter, *The Newsette*, in communications with potential investors of her company. The Forbes Article also reported that internal company materials contradicted Pierson's public claims that *The Newsette* generated $40 million in yearly revenue and that the company had a valuation of approximately $200 million—i.e., the same representation that Pierson made to the Plaintiffs at the New York City Meeting and during the investment process to bolster her credentials.

22

78. Troubled by the revelations in the Forbes Article, the Plaintiffs immediately contacted Teefey for an explanation. Shockingly, Teefey responded that, before her ouster from the Company, Pierson had misappropriated investor funds—including the Plaintiffs' funds—to fund her lavish lifestyle, including to pay the rent on her New York City apartment, which was approximately $60,000 per month, among other personal expenses. Teefey further stated that Pierson had misled other Company executives to conceal her fraud. Perplexingly, although Pierson had departed from Wondermind in January 2023—almost three years before the publication of the Forbes Article—Teefey failed to alert the Plaintiffs about Pierson's misappropriation until shortly after the release of the article, and only after the Plaintiffs inquired about it. Indeed, at the time that Pierson departed from the Company—which the Plaintiffs understood was a voluntary departure for Pierson to focus on her other business ventures—the Defendants said nothing about these issues, much less anything about Pierson's longstanding feud with Teefey and what Teefey claimed were Pierson's flagrant, brazen breaches of her fiduciary duties.

### The Cut Article

79. Soon after the publication of the Forbes Article, the Plaintiffs would come to appreciate the sheer magnitude of the fraud that the Defendants had foisted upon them.

80. Specifically, on September 3, 2025, *The Cut* published an article titled, "What Happened at Wondermind? Selena Gomez and her mother, Mandy Teefey, flipped their mental-health journeys into a buzzy start-up. It all fell apart" (i.e., the Cut Article). The Article, a detailed investigative report about Wondermind's business operations based on interviews with over a dozen witnesses—including current and former Company employees—recounted, in painstaking detail, the significant operational, financial, and management issues at the Company.

81.     The accounts in the Cut Article collectively showed that Wondermind was not—and could not have been—what the Defendants had represented to the Plaintiffs during the investment process: i.e., a high-growth startup with the infrastructure, resources, and personnel necessary to operationalize. Instead, the accounts in the Cut Article collectively show that, from the outset, Wondermind had *no plan* for its future—much less a plan for achieving a multi-billion-dollar valuation. The following accounts are illustrative of the misrepresentations that the Defendants made to the Plaintiffs in connection with their investment.

82.     **Misrepresentations about Gomez's involvement.** First, the Cut Article reported that from the outset of the Company's operations, Teefey drew an "unnecessarily hard line" between her and Gomez, to show that the Company was independent from Gomez. As the Article reported, Teefey's orientation in this regard was motivated by her personal animus towards Gomez, with whom Teefey has a difficult relationship. The Article also noted that Teefey's interpersonal disputes with Gomez resulted in her rejection of valuable corporate opportunities, including business partnerships and additional investments that were drawn to Wondermind based on Gomez's purported involvement, because Teefey had "found this interest offensive and taken it as a personal slight." Likewise, the Article reported that Company employees described Gomez "as disinterested, at best, in the company," and that, on the few occasions in which Gomez publicized Wondermind, such engagement resulted not from a genuine desire to assist the Company but, instead, from repeated pressure on Gomez's staff to highlight the Company. These accounts directly contradicted the Defendants' representations during the investment process that Gomez would play a central role in the Company, including as its Chief Impact Officer and "head of marketing," and that Gomez would provide services under the Consulting Agreement. Indeed, to the extent that a Consulting Agreement even exists, it is now apparent that Gomez immediately

24

and utterly breached her contractual duties under the agreement, including by actively distancing herself from the Company based on these undisclosed personal issues with Teefey.

83. **Misrepresentations about Pierson's role and involvement.** Second, the Cut Article reported that according to Company employees, Teefey and Pierson had an "openly tense, even hostile" relationship "from the company's first days." These accounts directly contradicted the Defendants' representations during the investment process that Pierson was poised to exercise managerial and operational control over the Company as co-CEO. These accounts also directly contradicted Wondermind's representation and warranty in Section 2.15(c) of the SPA that "no Key Employee," which included Pierson, "intends to terminate employment with the Company or is otherwise likely to become unavailable to continue as a Key Employee." Crucially, as noted, the Company ousted Pierson in January 2023, only a few months after the Plaintiffs' investments, and after a longstanding feud with Teefey, which was underway at the time of the investments. As noted, Teefey and Pierson signed the SPA on Wondermind's behalf, making incredible any claim that either lacked the requisite knowledge about Pierson's precarious position at the Company.

84. **Misrepresentations about Teefey's capacity.** Third, in particularly vivid detail, the Cut Article reported that Teefey appeared to suffer from substance abuse issues, resulting in erratic behavior and bizarre outbursts, including hallucinations. As reported in the Article, Teefey's substance abuse issues resulted in "disappearances that lasted days or even weeks." The Article reported that Company employees often observed Teefey at Wondermind's offices engaging in non-work-related activities "in the middle of the workday," and that she also appeared to be intoxicated during work hours. Damningly, one source quoted in the Article bluntly stated that Gomez "'knew her mother was not well enough to be running that company.'" Moreover, the Article reported that from the inception of Wondermind's operations, "Pierson assessed Teefey . .

25

. as 'unable to deliver anything' she'd promised, and some employees were starting to suspect the same." These accounts directly contradicted the Defendants' representations during the investment process that Teefey was fit to serve as an officer and director of the Company.

85.    **Misrepresentations about Wondermind's operations, financial wherewithal, and growth trajectory.** Fourth, and finally, the Cut Article reported that for several years before the publication of the Article, Wondermind had been in a state of utter financial and operational disarray. The Article reported, for example, that by the summer of 2023, Teefey "bluntly" acknowledged "that Wondermind's financial situation was untenable," that the Company was struggling to secure Series B investors, and that Gomez "had stepped in multiple times to cover employee payroll." The Article further reported that by the fall of 2024, the Company's finances were "undeniably dire," which caused the Company to cancel some of its offerings, to terminate relationships with critical vendors, and to terminate essentially all of its employees. Meanwhile, as the Article recounts, Teefey appeared to be making no visible progress on initiatives that she had represented to the Plaintiffs were in development, such as the Wondermind App, which the Defendants represented years earlier would be the centerpiece of the Company's offerings.

86.    None of this was disclosed to the Plaintiffs. Instead, at every turn, including as late as March 2025—when, as the Article reported, Wondermind missed employee payroll and was forced to terminate its employees' insurance coverage—the Defendants affirmatively misrepresented that the Plaintiffs' investments were secure, that the Company was thriving, and that the Company was on the verge of an acquisition by a "huge player."

87.    Apart from proving that the Defendants defrauded the Plaintiffs by failing to disclose these issues during the life of their investment, the revelations in the Article show that the

26

Defendants had no basis—much less a reasonable basis—for their statements about Wondermind's operations, products, and growth trajectory.

88.    In stark contrast to the Defendants' statements during the investment process, the Cut Article revealed that financial and operational turmoil afflicted Wondermind from the very outset. During the investment process, the Defendants represented, among other things, that the Company had a suite of revenue-generating digital products ready for deployment; that it had lucrative partnerships with large institutions that would allow it to immediately generate revenue, even outside of the Company's digital offerings; and that the Company was otherwise developing a robust infrastructure for the marketing, sale, and use of its services. As the Article makes manifest, however, none of these initiatives ever materialized—much less on the timeline that the Defendants promised during the investment process. Indeed, as the Article reported, the Wondermind App—the funding of which was the primary purpose of the Plaintiffs' investments—has ***never*** come to fruition. And given the vignettes in the Article, painting Wondermind as a personal slush fund for its principals, it is likewise manifest that the Company has used investor monies not for legitimate business purposes (as contractually required under the SPA) but, instead, for unauthorized uses having nothing to do with the Company's operations.

89.    In short, the significant operational, financial, and management issues recounted in the Article—showing that Wondermind is, and always has been, afflicted by waste and utter mismanagement—show that the Defendants had no reasonable basis for their representations to the Plaintiffs about the Company's operations, financial wherewithal, and growth trajectory.

## V.   THE DEFENDANTS CONTINUE TO MISLEAD THE PLAINTIFFS

90. On November 25, 2025, in the wake of the Cut Article, the Plaintiffs sent the Defendants a notice of rescission, demanding rescission of their investments and the return of their investment funds.

91. The Defendants did not respond, in substance, to the notice. Instead, consistent with their apparent penchant for misrepresentation, they continued to lull and mislead the Plaintiffs.

92. In this connection, on November 25, 2025—i.e., the day of the Plaintiffs' notice—Teefey immediately emailed Resnick (who was represented by counsel), noting that she would "respond in 10 days as requested," downplaying "the accusations of my misconduct and financial disarray," and representing that despite the issues revealed in the Article, the Company was "now on track to release products in the first quarter to straight profit."

93. Teefey never substantively responded to the notice. Instead, in the months that followed, Teefey's account of what had become of the Plaintiffs' investment shifted from one story to the next.

94. On April 8, 2026, when Resnick asked Teefey whether there were any updates on the Company, Teefey replied: "Hi Andrew - I guess I am confused. I thought we returned your investment along with the other investors you came in with. So, I am confused about owing you updates. Please advise." Wondermind had returned nothing, to Resnick or to any of the Plaintiffs. When Resnick responded that he had received no funds and asked which investors had been paid back, Teefey deflected: "That would be a question for Selena's legal team. I am not sure I am at liberty to give that info out, but I will touch base with them so they can reach out to you. I'll connect you once they respond." No one from Gomez's legal team has ever contacted the Plaintiffs.

95.    The next day, on April 9, 2026, Teefey sent Resnick an email alluding to an unidentified "lawsuit" and unidentified "negotiations." Although Resnick did not understand to what, exactly, Teefey was referring, Teefey wrote:

> I just forwarded this to PJ Shapiro and Thomas Kingsley. Our lawyers were not handling but we did answer the lawsuit and I know negotiations have been happening. So, please do not need anymore threats on lawsuits that should be towards our co founder Daniella since all allegations were her actions. Thank you for your understanding and trust we have and will co to use [sic] take this seriously.

96.    Eventually, Teefey would claim that the Company had created a purported escrow account to facilitate the return of the Plaintiffs' investments. But when the Plaintiffs repeatedly followed up with Teefey to obtain details about that purported escrow account, Teefey disappeared. In short, there was no escrow account; instead, consistent with the yearslong scheme of deceit that the Defendants have perpetrated, it appears that Teefey fabricated this account to further lull the Plaintiffs, and to encourage them to forbear from filing suit.

97.    All conditions precedent to the filing of this lawsuit have been performed, have been waived, or have otherwise occurred.

### <u>CLAIMS FOR RELIEF</u>

### <u>COUNT I:</u>
**Securities Fraud: Violation of Rule 10b-5**
**15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5**
**(Against Wondermind)**

98.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 97 of the Complaint, as if those allegations appeared in this count.

99.    This is a claim against Wondermind for securities fraud, in violation of Rule 10b-5 under the Securities Exchange Act of 1934.

100.    In connection with the sale of Series A Preferred Stock to the Plaintiffs, Wondermind—through the Individual Defendants, in their capacities as officers, directors, and

29

shareholders of the Company—made misstatements or omissions of material fact to the Plaintiffs

to induce their purchases of the stock. The Defendants made these misrepresentations throughout

the investment process, including at the New York City Meeting, in the June 2022 Email, and in

Wondermind's "pre-launch investment 2-pager." As alleged in detail above, Wondermind's

material misrepresentations during the investment process included:

(i)     Misrepresenting that Gomez would be intimately involved in the Company as Wondermind's Chief Impact Officer and "head of marketing," when the Defendants knew that the long-running, undisclosed personal disputes between Teefey and Gomez would make such involvement impracticable;

(ii)     Misrepresenting Pierson's business background and accolades, including Pierson's claims to the Plaintiffs that *The Newsette* generated $40 million in yearly revenue and had a valuation of approximately $200 million, when Pierson knew that these representations were false;

(iii)     Misrepresenting that Pierson was poised to exercise primary operational and managerial control over Wondermind, when the Defendants knew of the long-running personal feud between Teefey and Pierson, which was underway at the time of the Plaintiffs' investments, and which would result in Pierson's ouster from the Company only a few months after the investment;

(iv)     Misrepresenting Teefey's fitness to serve as an officer and director of the Company, when the Defendants knew that Teefey had substance abuse issues that diminished her capacity to administer the Company, and when the Defendants knew that Teefey was otherwise unfit to manage the Company;

(v)     Misrepresenting the nature and progress of Wondermind's existing and contemplated products, services, and financial wherewithal, including the Company's digital products, business partnerships, and revenue sources, when the Defendants knew that these initiatives did not exist, were not feasible, or were due to be obviated by the Individual Defendants' use of investor funds for non-business purposes, including misappropriation for personal purposes; and

(vi)     Misrepresenting the growth trajectory of the Company, including in its business plan, which forecasted a multi-billion-dollar "potential future value," when Wondermind had no reasonable basis for such projections or predictions.

101.     The Plaintiffs reasonably relied on these misrepresentations in purchasing Series A

Preferred Stock from Wondermind.

30

102.    In making these misrepresentations, Wondermind acted with scienter because, as alleged in detail above, with respect to each material misrepresentation, the Defendants knew that the misrepresentation was false when made or, at minimum, the Defendants acted recklessly with respect to the truth or falsity of the representations, for all of the reasons alleged in paragraph 100 and elsewhere in this Complaint.

103.    As a result of the Plaintiffs' reliance on these misrepresentations, the Plaintiffs suffered loss, including, without limitation, the diminution in value of the Plaintiffs' shares in Wondermind. For example, the Defendants' misrepresentations related to products, services, and offerings that would have created value for Wondermind. Because those initiatives do not exist (and have never existed), the Company failed to operationalize as represented, rendering the Plaintiffs' shares in the Company worthless.

As to Count I of the Complaint, the Plaintiffs request that the Court enter judgment against Wondermind for damages; rescission (in the alternative to damages); pre- and post-judgment interest; costs; attorney's fees as provided under applicable law; and all other relief to which they may be entitled.

## COUNT II:
### Securities Fraud: Violation of Rule 10b-5 (Control Person Liability)
### 15 U.S.C. § 78t
### (Against the Individual Defendants)

104.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 97 of the Complaint, as if those allegations appeared in this count.

105.    This is a claim against the Individual Defendants—Teefey, Pierson, and Gomez— for control person liability under 15 U.S.C. § 78t, to hold them jointly and severally liable for Wondermind's primary violation of Rule 10b-5.

31

106. As officers, directors, and collective majority shareholders of Wondermind, the Individual Defendants were control persons of the Company. Among other powers, in their various roles with Wondermind, each Individual Defendant had the power to influence and control, and did influence and control, directly and indirectly, the Company's decision-making, including the content and dissemination of the various misrepresentations described in this Complaint.

107. As fully alleged above in Count I, Wondermind violated Rule 10b-5.

108. Each Individual Defendant was a culpable participant in Wondermind's violation of Rule 10b-5. Among other conduct, and as fully alleged above, the Individual Defendants participated in the solicitation of the Plaintiffs' investments in Wondermind, including, without limitation, by attending the New York City Meeting, sending the June 2022 Email, providing the "pre-launch investment 2-pager," and signing the SPA and Transaction Documents on the Company's behalf. Gomez also held herself out as Wondermind's CIO or "Chief Impact Officer," an affiliation that the Company publicly perpetuated to lure investors, including the Plaintiffs.

109. Likewise, in their various capacities at the Company, the Individual Defendants had the power to influence and control, and did influence and control, corporate policy, including the identification, solicitation, and procuring of investors, including the Plaintiffs, and the content and dissemination of the Company's representations to investors, including the Plaintiffs.

110. As a result of Wondermind's violation of Rule 10b-5, the Plaintiffs have suffered loss, including, without limitation, the diminution in value of their shares in Wondermind.

As to Count II of the Complaint, the Plaintiffs request that the Court enter judgment against the Individual Defendants, jointly and severally with each other and with Wondermind, for damages; rescission (in the alternative to damages); pre- and post-judgment interest; costs; attorney's fees as provided under applicable law; and all other relief to which they may be entitled.

**COUNT III:**
**Securities Fraud: Violation of Rule 10b-5**
**15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5**
**(Against Pierson)**

111.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 97 of the Complaint, as if those allegations appeared in this count.

112.    This is a claim against Pierson for securities fraud, in violation of Rule 10b-5 under the Securities Exchange Act of 1934.

113.    In connection with the sale of Series A Preferred Stock to the Plaintiffs, Pierson—on behalf of Wondermind—made misstatements or omissions of material fact to the Plaintiffs to induce their purchases of the stock. The Defendants, including Pierson, made these misrepresentations throughout the investment process, including at the New York City Meeting, in the June 2022 Email, and in Wondermind's "pre-launch investment 2-pager," each of which Pierson attended, sent, or otherwise ratified. As alleged in detail above, Pierson's material misrepresentations during the investment process included:

(i)    Misrepresenting that Gomez would be intimately involved in the Company as Wondermind's Chief Impact Officer and "head of marketing," when Pierson knew that the long-running, undisclosed personal disputes between Teefey and Gomez would make such involvement impracticable;

(ii)    Misrepresenting Pierson's business background and accolades, including Pierson's claims to the Plaintiffs that *The Newsette* generated $40 million in yearly revenue and had a valuation of approximately $200 million, when Pierson knew that these representations were false;

(iii)    Misrepresenting that Pierson was poised to exercise primary operational and managerial control over Wondermind, when Pierson knew of the long-running personal feud between her and Teefey, which was underway at the time of the Plaintiffs' investments, and which would result in Pierson's ouster from the Company only a few months after the investment;

(iv)    Misrepresenting Teefey's fitness to serve as an officer and director of the Company, when Pierson knew that Teefey had substance abuse issues that

33

diminished her capacity to administer the Company, and when Pierson knew that Teefey was otherwise unfit to manage the Company;

(v) Misrepresenting the nature and progress of Wondermind's existing and contemplated products, services, and financial wherewithal, including the Company's digital products, business partnerships, and revenue sources, when Pierson knew that these initiatives did not exist, were not feasible, or were due to be obviated by the Individual Defendants' use of investor funds for non-business purposes, including Pierson's misappropriation for personal purposes; and

(vi) Misrepresenting the growth trajectory of the Company, including in its business plan, which forecasted a multi-billion-dollar "potential future value," when Pierson had no reasonable basis for such projections or predictions.

114. The Plaintiffs reasonably relied on these misrepresentations in purchasing Series A Preferred Stock from Wondermind.

115. In making these misrepresentations, Pierson acted with scienter because, as alleged in detail above, with respect to each material misrepresentation, Pierson knew that the misrepresentation was false when made or, at minimum, Pierson acted recklessly with respect to the truth or falsity of the representations, for all of the reasons alleged in paragraph 113 and elsewhere in this Complaint.

116. As a result of the Plaintiffs' reliance on these misrepresentations, the Plaintiffs suffered loss, including, without limitation, the diminution in value of the Plaintiffs' shares in Wondermind.

As to Count III of the Complaint, the Plaintiffs request that the Court enter judgment against Pierson for damages; rescission (in the alternative to damages); pre- and post-judgment interest; costs; attorney's fees as provided under applicable law; and all other relief to which they may be entitled.

34

## COUNT IV:
### Common Law Fraud (Fraudulent Inducement of the Plaintiffs' Investments)
### (Against All Defendants)

117.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 97 of the Complaint, as if those allegations appeared in this count.

118.    This is a claim against all Defendants for common law fraud, based on the Defendants' fraudulent inducement of the Plaintiffs' investments in Wondermind.

119.    In connection with the sale of Series A Preferred Stock to the Plaintiffs, Wondermind (through the Individual Defendants, and in their capacities as officers, directors, and shareholders of the Company) and the Individual Defendants made misstatements or omissions of material fact to the Plaintiffs to induce their purchases of the stock. The Defendants made these misrepresentations throughout the investment process, including at the New York City Meeting, in the June 2022 Email, and in Wondermind's "pre-launch investment 2-pager." As alleged in detail above, the Defendants' material misrepresentations during the investment process included:

(i)    Misrepresenting that Gomez would be intimately involved in the Company as Wondermind's Chief Impact Officer and "head of marketing," when the Defendants knew that the long-running, undisclosed personal disputes between Teefey and Gomez would make such involvement impracticable;

(ii)    Misrepresenting that Gomez was Wondermind's Chief Impact Officer and "head of marketing," an affiliation that Gomez publicly promoted, when the Defendants knew that Gomez had no intention of performing these roles;

(iii)    Misrepresenting Pierson's business background and accolades, including Pierson's claims to the Plaintiffs that *The Newsette* generated $40 million in yearly revenue and had a valuation of approximately $200 million, when Pierson knew that these representations were false;

(iv)    Misrepresenting that Pierson was poised to exercise primary operational and managerial control over Wondermind, when the Defendants knew of the long-running personal feud between Teefey and Pierson, which was underway at the time of the Plaintiffs' investments, and which would result in Pierson's ouster from the Company only a few months after the investment;

35

(v)     Misrepresenting Teefey's fitness to serve as an officer and director of the Company, when the Defendants knew that Teefey had substance abuse issues that diminished her capacity to administer the Company, and when the Defendants knew that Teefey was otherwise unfit to manage the Company;

(vi)     Misrepresenting the nature and progress of Wondermind's existing and contemplated products, services, and financial wherewithal, including the Company's digital products, business partnerships, and revenue sources, when the Defendants knew that these initiatives did not exist, were not feasible, or were due to be obviated by the Individual Defendants' use of investor funds for non-business purposes, including misappropriation for personal purposes; and

(vii)     Misrepresenting the growth trajectory of the Company, including in its business plan, which forecasted a multi-billion-dollar "potential future value," when the Defendants had no reasonable basis for such projections or predictions.

120.     The Plaintiffs justifiably relied on these misrepresentations in purchasing Series A Preferred Stock from Wondermind.

121.     In making these misrepresentations, the Defendants knew that the misrepresentations were false when made or, at minimum, the Defendants acted recklessly with respect to the truth or falsity of the representations, for all of the reasons alleged in paragraph 119 and elsewhere in this Complaint.

122.     As a result of the Plaintiffs' reliance on these misrepresentations, the Plaintiffs suffered loss, including, without limitation, out-of-pocket damages.

As to Count IV of the Complaint, the Plaintiffs request that the Court enter judgment against the Defendants, jointly and severally, for damages; rescission (in the alternative to damages); pre- and post-judgment interest; costs; attorney's fees as provided under applicable law; and all other relief to which they may be entitled.

## COUNT V:
### Breach of Contract – Use of Investor Proceeds
### (Against Wondermind)

123.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 97 of the Complaint, as if those allegations appeared in this count.

124.    This is a claim against Wondermind for breach of the Stock Purchase Agreement, based on Wondermind's use of investor funds for non-business purposes.

125.    The SPA is a valid contract between the Plaintiffs and Wondermind.

126.    In Section 1.4 of the SPA, titled "Use of Proceeds," Wondermind agreed that "[i]n accordance with the directions of the Board of Directors . . . the Company will use the proceeds from the sale of the Shares for product development and other general corporate purposes." Section 1.4 is a covenant that Wondermind made to each Plaintiff, individually, as a party to the SPA.

127.    Wondermind breached Section 1.4 of the SPA by failing to use the investors' funds for product development, and by otherwise failing to use the funds for legitimate business purposes. Among other potential breaches of Section 1.4, as alleged above, in August 2025—in response to the Plaintiffs' inquiries about the Forbes Article concerning Pierson—Teefey indicated that Pierson had misappropriated investor funds to pay the lavish rent on her New York City apartment and other personal expenses, in flagrant breach of Section 1.4.

128.    As a result of Wondermind's breach of the SPA, the Plaintiffs have been damaged in an amount to be determined at trial, including, without limitation, in the amount of the Plaintiffs' principal investments.

As to Count V of the Complaint, the Plaintiffs request that the Court enter judgment against Wondermind for damages; rescission (in the alternative to damages); pre- and post-judgment

37

interest; costs; attorney's fees as provided under applicable law; and all other relief to which they may be entitled.

## COUNT VI:
### Rescission – Failure to Satisfy Conditions Precedent
### (Against Wondermind)

129.   The Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 97 of the Complaint, as if those allegations appeared in this count.

130.   This is a claim against Wondermind for rescission of the Stock Purchase Agreement, based on Wondermind's failure to satisfy an express closing condition to the Plaintiffs' obligation to close the investment transaction.

131.   The SPA is a valid contract between the Plaintiffs and Wondermind.

132.   Under Section 4.15 of the SPA, it was an express closing condition for Gomez to "have entered into a services agreement with the Company concerning the matters set forth on **Exhibit I**," which agreement would govern the services that she would provide to Wondermind. Although Wondermind purported to attach a form of the Consulting Agreement to the SPA, to date, Wondermind has failed to provide either Plaintiff with a copy of the purported agreement. Upon information and belief, Gomez has never entered into the Consulting Agreement.

133.   Given Gomez's failure to enter into the Consulting Agreement, the express closing condition in Section 4.15 of the SPA was never satisfied, thus obviating the Plaintiffs' obligation to close the investment transaction.

134.   As a result of Wondermind's failure to satisfy conditions precedent, the Plaintiffs are entitled to rescission of the SPA and restitution of their principal investments, with damages in the alternative in an amount to be determined at trial.

38

As to Count VI of the Complaint, the Plaintiffs request that the Court enter judgment against Wondermind for rescission; damages (in the alternative to rescission); pre- and post-judgment interest; costs; attorney's fees as provided under applicable law; and all other relief to which they may be entitled.

**COUNT VII:**
**Breach of Contract – Breach of Express Representations and Warranties**
**(Against Wondermind)**

135.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 97 of the Complaint, as if those allegations appeared in this count.

136.    This is a claim against Wondermind for breach of the Stock Purchase Agreement, based on Wondermind's breach of express representations and warranties in the SPA.

137.    The SPA, which Teefey and Pierson signed on Wondermind's behalf, is a valid contract between the Plaintiffs and Wondermind.

138.    In Section 2.15(c) of the SPA, Wondermind represented and warranted that "no Key Employee intends to terminate employment with the Company or is otherwise likely to become unavailable to continue as a Key Employee. The Company does not have a present intention to terminate the employment of any of the foregoing." The definition of "Key Employee" expressly includes Pierson. Wondermind breached this representation and warranty because, as fully detailed above, at the time that Wondermind entered into the SPA, a longstanding personal dispute between Teefey and Pierson was underway, which rendered Pierson's position in the Company precarious, and which, indeed, resulted in Pierson's ouster from Wondermind in January 2023, only months after the transaction. As a result, Wondermind's representation and warranty in Section 2.15(c) was false when made.

139. In Section 2.24 of the SPA, Wondermind represented and warranted, among other things, that the Company's business plan, including projections that it had provided to the Plaintiffs, "was prepared in good faith." Among other representations during the investment process, Wondermind represented that the Company had a "potential future value" of over $4 billion. As revealed in the Cut Article, however, in the more than three years between the Plaintiffs' investment and the publication of the Article, Wondermind not only failed to operationalize into a multi-billion-dollar enterprise; it utterly failed to do anything that the Defendants had promised during the investment process, including developing the Wondermind App, obtaining business partnerships, and securing meaningful revenue sources. As also discussed above, a cornerstone of Wondermind's business plan was the Defendants' representation that Pierson had already built a successful company valued at $200 million, and generating $40 million in yearly revenue—which was abjectly false. As a result, at the time that Wondermind entered into the SPA, it had no good-faith basis for its purported business plan, including the baseless projection that Wondermind would be a multi-billion-dollar company.

140. Finally, in Section 2.24 of the SPA, Wondermind also represented and warranted that none of its representations or warranties in the Agreement "contains any untrue statement of a material fact or, to the Company's knowledge, omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made." Wondermind breached this representation and warranty by making the false and misleading representations and warranties in Sections 2.15(c) and 2.24 of the SPA.

141. As a result of Wondermind's breaches of these express representations and warranties, which went to the very core of the Plaintiffs' decision to invest in Wondermind, the Plaintiffs have suffered damage in an amount to be determined at trial.

40

As to Count VII of the Complaint, the Plaintiffs request that the Court enter judgment against Wondermind for damages; rescission (in the alternative to damages); pre- and post-judgment interest; costs; attorney's fees as provided under applicable law; and all other relief to which they may be entitled.

### COUNT VIII:
**Conversion**
**(Against Pierson)**

142.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 97 of the Complaint, as if those allegations appeared in this count.

143.    This is a claim against Pierson for conversion.

144.    The Plaintiffs had a property interest in their investment funds. When the Plaintiffs invested in Wondermind, the parties agreed that the Company would use the investment funds only for product development and other legitimate business purposes. The Plaintiffs never consented to any other use of their funds, which were therefore identifiable property dedicated to a specific purpose rather than a general obligation dischargeable in money.

145.    Pierson wrongfully possessed and disposed of the Plaintiffs' investment funds and thereby converted them. As alleged above, according to Teefey, Pierson misappropriated investment funds, including the Plaintiffs' funds, and converted them to her own use, including to pay for the lavish rent at her New York City apartment and other personal expenses.

146.    As a result of Pierson's conversion of the Plaintiffs' investment funds, the Plaintiffs have suffered damage in an amount to be determined at trial.

As to Count VIII of the Complaint, the Plaintiffs request that the Court enter judgment against Pierson for damages; pre- and post-judgment interest; costs; attorney's fees as provided under applicable law; and all other relief to which they may be entitled.

## COUNT IX:
### Unjust Enrichment (In the Alternative to Conversion)
### (Against Pierson)

147.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 97 of the Complaint, as if those allegations appeared in this count.

148.    This is a claim against Pierson for unjust enrichment.

149.    By misappropriating the Plaintiffs' investment funds for her own personal purposes, as fully alleged above, Pierson enriched herself, and impoverished the Plaintiffs, without justification.

150.    Pierson's enrichment came directly at the Plaintiffs' expense, because the funds that she misappropriated were the consideration that the Plaintiffs paid for their investments in Wondermind, which was restricted to legitimate business purposes.

151.    To the extent that Pierson's misappropriation is not cognizable under the tort of conversion, the Plaintiffs lack a remedy at law.

As to Count IX of the Complaint, the Plaintiffs request that the Court enter judgment against Pierson for disgorgement of all ill-gotten gains; the imposition of a constructive trust over all ill-gotten gains; an accounting of Pierson's use of the Plaintiffs' investment funds; damages (in the alternative to equitable remedies); pre- and post-judgment interest; costs; attorney's fees as provided under applicable law; and all other relief to which they may be entitled.

## COUNT X:
### Common Law Fraud (Post-Investment Misrepresentations and Concealment)
### (Against All Defendants)

152.    The Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 97 of the Complaint, as if those allegations appeared in this count.

42

153. This is a claim against all Defendants for common law fraud, based on their misrepresentations and concealment concerning the state of Wondermind's operations, finances, and managerial issues during the life of the Plaintiffs' investments.

154. After the Plaintiffs invested, Wondermind—through the Individual Defendants— repeatedly misrepresented the Company's operational and financial condition to the Plaintiffs, and concealed from the Plaintiffs the material facts described above, including the Company's inability to operationalize, its deteriorating finances, its failure to pay its employees and critical vendors, and Pierson's misappropriation of investor funds.

155. As alleged in detail above, these representations included, without limitation:

(i) On December 8, 2022, Pierson wrote to Peikin of Bespoke, copying Teefey and Gomez, representing that Wondermind had experienced "massive growth," had "exceeded all of our 1-year goals in only 6 months," and had "closed $1.7M in revenue," and soliciting Bespoke's participation in a Series B round, when the Company's actual condition was materially worse than represented and when the co-founders' relationship had already deteriorated to the point that Pierson would depart weeks later;

(ii) In several emails and phone calls from 2022 to 2025, the Defendants concealed and misrepresented the state of the Company's operations in updates to the Plaintiffs;

(iii) On March 9, 2025, in response to Resnick's repeated requests for updates about the Company's progress, Teefey represented that Wondermind was preparing a "huge Summer launch" of the Wondermind App, that two investors were prepared to commit at the "1,000,000 level" and at a "multi-mil" level, and that the Company was "being courted by a huge player in media/Entertainment" for a potential acquisition—in the very month that Wondermind failed to make payroll and terminated its employees' insurance coverage;

(iv) On November 25, 2025, in response to the Plaintiffs' notice of rescission, Teefey downplayed "the accusations of my misconduct and financial disarray" and represented that the Company was "now on track to release products in the first quarter straight to profit," when the Company had missed payroll twice, had terminated nearly all of its employees, and had never launched the products it repeatedly represented to the Plaintiffs were in development; and

(v)      Thereafter, Teefey represented that Wondermind had established a purported escrow account to facilitate the return of the Plaintiffs' investment funds, when no such account existed and no such return was contemplated.

156.    Each of these representations was materially false when made, and each concealed material facts that the Defendants knew and that the Plaintiffs did not.

157.    The Defendants knew that these representations were false when made or, at minimum, acted with reckless disregard as to their truth or falsity. As officers, directors, and collective majority shareholders of Wondermind, the Defendants knew the Company's actual operational and financial condition at all relevant times.

158.    The Defendants made these misrepresentations to induce the Plaintiffs to refrain from acting to protect their investments—including by refraining from demanding rescission, from pursuing the Company's books and records, and from filing suit—and to lull the Plaintiffs into continued inaction.

159.    The Plaintiffs justifiably relied on these representations. As alleged above, the Plaintiffs were minority investors in Wondermind, held no board seat or board observer right, and were not "Major Investors" entitled to financial statements or other formal updates under the Investors' Rights Agreement. The only information available to the Plaintiffs about the Company's condition was the information that the Defendants chose to provide. Having repeatedly sought that information and received assurances that the Company was performing well—indeed, thriving—the Plaintiffs reasonably refrained from taking action to protect their investments.

160.    As a result of the Defendants' misrepresentations and concealment, the Plaintiffs were damaged in an amount to be determined at trial, including, without limitation, by the loss of the opportunity to rescind their investments, to demand the return of their funds, or to otherwise act to protect their interests at a time when doing so may have afforded them a meaningful remedy.

44

161.   The Defendants' conduct further estops them from asserting any statute of limitations defense to the Plaintiffs' claims. As alleged above, the Defendants' misrepresentations were calculated to, and did, lull the Plaintiffs from discovering the facts underlying their claims, and were calculated to, and did, induce the Plaintiffs to forbear from filing suit.

As to Count X of the Complaint, the Plaintiffs request that the Court enter judgment against the Defendants, jointly and severally, for damages; pre- and post-judgment interest; costs; attorney's fees as provided under applicable law; and all other relief to which they may be entitled.

## COUNT XI:
### Equitable Fraud (Post-Investment Misrepresentations and Concealment)
### (Against All Defendants)

162.   The Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 97 of the Complaint, as if those allegations appeared in this count.

163.   This is a claim against all Defendants for equitable fraud, based on their misrepresentations and concealment concerning the state of Wondermind's operations, finances, and managerial issues during the life of the Plaintiffs' investments, in breach of the Individual Defendants' fiduciary duties to the Plaintiffs.

164.   After the Plaintiffs invested, Wondermind—through the Individual Defendants—repeatedly misrepresented the Company's operational and financial condition to the Plaintiffs, and concealed from the Plaintiffs the material facts described above, including the Company's inability to operationalize, its deteriorating finances, its failure to pay its employees and critical vendors, and Pierson's misappropriation of investor funds.

165.   As alleged in detail above, these representations included, without limitation:

(i)   On December 8, 2022, Pierson wrote to Peikin of Bespoke, copying Teefey and Gomez, representing that Wondermind had experienced "massive growth," had "exceeded all of our 1-year goals in only 6 months," and had "closed $1.7M in revenue," and soliciting Bespoke's participation in a Series B round, when

the Company's actual condition was materially worse than represented and when the co-founders' relationship had already deteriorated to the point that Pierson would depart weeks later;

(ii)    In several emails and phone calls from 2022 to 2025, the Defendants concealed and misrepresented the state of the Company's operations in updates to the Plaintiffs;

(iii)    On March 9, 2025, in response to Resnick's repeated requests for updates about the Company's progress, Teefey represented that Wondermind was preparing a "huge Summer launch" of the Wondermind App, that two investors were prepared to commit at the "1,000,000 level" and at a "multi-mil" level, and that the Company was "being courted by a huge player in media/Entertainment" for a potential acquisition—in the very month that Wondermind failed to make payroll and terminated its employees' insurance coverage;

(iv)    On November 25, 2025, in response to the Plaintiffs' notice of rescission, Teefey downplayed "the accusations of my misconduct and financial disarray" and represented that the Company was "now on track to release products in the first quarter straight to profit," when the Company had missed payroll twice, had terminated nearly all of its employees, and had never launched the products it repeatedly represented to the Plaintiffs were in development; and

(v)    Thereafter, Teefey represented that Wondermind had established a purported escrow account to facilitate the return of the Plaintiffs' investment funds, when no such account existed and no such return was contemplated.

166.    Each of these representations was materially false when made, and each concealed material facts that the Defendants knew and that the Plaintiffs did not.

167.    The Defendants knew that these representations were false when made or, alternatively, acted with reckless disregard as to their truth or falsity. As officers, directors, and collective majority shareholders of Wondermind, the Defendants knew the Company's actual operational and financial condition at all relevant times. At the very minimum, as fiduciaries, the Individual Defendants had a duty to exercise reasonable care in providing the Plaintiffs with accurate information on the status of their investments, and of the Company's operations, based on the Plaintiffs' pecuniary interests in their investments. The Defendants breached this duty.

46

168.    The Plaintiffs justifiably relied on these representations. As alleged above, the Plaintiffs were minority investors in Wondermind, held no board seat or board observer right, and were not "Major Investors" entitled to financial statements or other formal updates under the Investors' Rights Agreement. The only information available to the Plaintiffs about the Company's condition was the information that the Defendants chose to provide. Having repeatedly sought that information and received assurances that the Company was performing well—indeed, thriving—the Plaintiffs reasonably refrained from taking action to protect their investments.

169.    As a result of the Defendants' misrepresentations and concealment, the Plaintiffs were damaged in an amount to be determined at trial, including, without limitation, by the loss of the opportunity to rescind their investments, to demand the return of their funds, or to otherwise act to protect their interests at a time when doing so may have afforded them a meaningful remedy.

170.    The Defendants' conduct further estops them from asserting any statute of limitations defense to the Plaintiffs' claims. As alleged above, the Defendants' misrepresentations were calculated to, and did, lull the Plaintiffs from discovering the facts underlying their claims, and were calculated to, and did, induce the Plaintiffs to forbear from filing suit.

As to Count XI of the Complaint, the Plaintiffs request that the Court enter judgment against the Defendants, jointly and severally, for rescission; damages (in the alternative to rescission); pre- and post-judgment interest; costs; attorney's fees as provided under applicable law; and all other relief to which they may be entitled.

## JURY TRIAL DEMAND

Under Federal Rule of Civil Procedure 38, the Plaintiffs demand a jury trial on all claims and issues so triable.

47

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

*Of Counsel*:

By: */s/ Jaclyn C. Levy*

    Jaclyn C. Levy (No. 5631)

Bryan A. Almeida

    Nicole K. Pedi (No. 6236)

Jeffrey A. Neiman

    Megan R. Thomas (No. 7273)

Nikolas L. Volosin

    Hercules Plaza, 6th Floor

NEIMAN MAYS

    1313 N. Market Street

FLOCH & ALMEIDA, PLLC

    Wilmington, DE 19801

One Downtown

    Tel:  (302) 984-6000

1 S.E. 3rd Avenue, Suite 1800

    jlevy@potteranderson.com

Miami, FL 33131

    npedi@potteranderson.com

Washington, DC 20037

    mthomas@potteranderson.com

Tel:  (305) 434-4942

balmeida@nmfalawfirm.com

jneiman@nmfalawfirm.com

*Attorneys for Plaintiffs Wondermind SRS 44,*

nvolosin@nmfalawfirm.com

*LLC and Bespoke Wondermind SPV I, LLC*

Dated: August 13, 2026